IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELCO INSURANCE COMPANY LIMITED, a subrogee of ELI LILLY AND COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | No. 18 C 6800 |
| v. | ) ) | Judge John Z. Lee |
| SPIRIT TRUCKING COMPANY, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2014, Eli Lilly and Co. ("Eli Lilly") enlisted DHL Global Forwarding to move six tons of Pulmotil, a treatment for bovine respiratory disease, from England to Nebraska. In turn, DHL hired the German shipping firm Hapag-Lloyd, who then engaged several subcontractors to move the Pulmotil. A mechanic employed by one of those subcontractors, Spirit Trucking Co. ("Spirit"), used a blowtorch to remove a placard from the Pulmotil's container, igniting that container and destroying most of its contents. About four years later, ELCO Insurance Co. Ltd. ("ELCO"), a subrogee of Eli Lilly, brought this suit against Spirit to recover damages for the loss of the Pulmotil. Spirit has moved for summary judgment on the ground that a one-year limitations period bars ELCO's suit. For the reasons given below, the motion is granted.

I. **Background**[1]

A. The Pulmotil Shipment

In 2014, Eli Lilly's animal health division operated a facility in La Vista, Nebraska. Def.'s Stmt. Material Facts ("SOF") ¶ 6, ECF No. 33. That November, Eli Lilly purchased six tons of Pulmotil from a seller in Knowsley, England. *Id.* ¶ 12. To shuttle the Pulmotil from England to Nebraska, Eli Lilly retained DHL Global Forwarding and its affiliate, Danmar Lines (collectively "DHL").[2] *Id.* ¶ 8. Soon after, DHL issued the "Danmar Express Sea Waybill."[3] *Id.* ¶¶ 8–9; *see* Pl.'s Resp. Opp'n Def.'s Stmt. Material Facts ("RSOF") ¶ 33, ECF No. 35; Def.'s Ex. A, Danmar Waybill at 1, ECF No. 33-1. The Danmar Waybill designated Eli Lilly as the shipper, DHL as the forwarding agent, Nebraska as the place of delivery, and December 1, 2014 as the estimated delivery date. Danmar Waybill at 1.

B. The Hapag-Llyod Waybill

DHL engaged Hapag-Lloyd, a German shipping company, to help transport the Pulmotil. SOF ¶ 12. As part of its agreement with DHL, Hapag-Lloyd generated a sea waybill of its own. *Id.* ¶ 14. That document describes DHL as the shipper and

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

[2] Spirit's briefing explains that Danmar Lines is a subsidiary of DHL. *See* Def.'s Mem. Supp. Mot. Summ. J. at 2, ECF No. 33.

[3] A waybill is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods." *Waybill*, BLACK'S LAW DICTIONARY (11th ed. 2019).

2

consignee, and makes no mention of Eli Lilly. Pl.'s Stmt. Additional Facts ("SOAF") ¶ 35, ECF No. 33-1.

As relevant here, Hapag-Lloyd's waybill features the following "Himalaya" clause:[4]

> (1) The Carrier shall be entitled to sub-contract on any terms whatsoever the whole or any part of the Carriage.
>
> (2) . . . . [A]ll exemptions and limitations of and exoneration from liability provided by law or by the Terms and Conditions including the jurisdiction clause shall be available to such Servant or Agent.

*Id.* ¶ 20; *see* Def.'s Ex. D, Hapag-Lloyd Waybill ("Hapag-Lloyd Waybill") at 4 § 4, ECF No. 33-4.

The Hapag-Lloyd Waybill also includes a time-for-suit clause providing that:

> In any event, the carrier shall be discharged from all liability in respect of loss of or damage to the Goods, non-delivery, mis-delivery, delay or any other loss or damage connected to or related to the Carriage unless suit is brought within (one) 1 year after delivery of the Goods or the date when the Goods should have been delivered.

SOF ¶ 20; Hapag-Lloyd Waybill at 4 § 6. Before this suit, Eli Lilly had never seen the Hapag-Lloyd Waybill. SOAF ¶¶ 33, 35.

C.  **The Accident**

The Pulmotil's passage to Nebraska began smoothly, but ended badly. From Liverpool, a ship carried the Pulmotil across the Atlantic and delivered it to Halifax, Canada. SOF ¶ 26. Its ocean voyage complete, the Pulmotil then embarked on an uneventful rail journey to Chicago. *Id.* At that point, Hapag-Lloyd retained Spirit to

---

[4] "Clauses extending liability limitations take their name from an English case involving a steamship called *Himalaya.*" *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 20 n.2 (2004).

3

deliver the Pulmotil to another railway line for transit to Iowa, and then on to Nebraska. *Id.* ¶¶ 26–27.

But the Pulmotil never left Illinois. In keeping with its agreement with Hapag-Lloyd, Spirit "took possession of the Pulmotil at the CN Railway railyard in Harvey, Illinois at approximately 6:44 p.m. on December 1, 2014." SOAF ¶ 40. For the next few days, Spirit stored the container at its Chicago-area facility. *Id.* ¶ 47.

Then, on December 4, disaster struck. *Id.* ¶¶ 47–49. For reasons that remain unclear, one of Spirit's mechanics decided to remove a placard affixed to the Pulmotil container. *Id.* ¶ 50. Rather than use a scraper or his fingernails, as was Spirit's practice, the mechanic resorted to a blowtorch. *Id.* ¶¶ 50, 55.

As it turns out, Pulmotil is combustible. *Id.* ¶ 52. Ignited by the blowtorch, the Pulmotil and its container burned rapidly. *Id.* ¶¶ 56–60. By the time the fire department arrived and hosed the container down, much of the Pulmotil had been destroyed. *Id.* ¶ 56. ELCO filed this suit seeking compensation for the burned Pulmotil in October 2018, nearly four years after the incident. SOF ¶ 1.

## II. <u>Legal Standard</u>

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmovant must then set forth specific facts demonstrating that there are

disputed material facts that must be decided at trial. *Id.* at 321–22. The nonmovant satisfies this burden where "the evidence is such that a reasonable jury could return a verdict" for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Analysis

This dispute centers around whether the Hapag-Lloyd Waybill's time-for-suit provision bars ELCO's claim. To resolve that dispute, the Court must address four questions. First, is the Hapag-Lloyd Waybill enforceable? Second, does it bind ELCO? Third, does it cover Spirit's conduct? And finally, does the time-for-suit provision excuse reckless acts? Because the answer to all four questions is "yes," Spirit's motion for summary judgment is granted.

#### A. The Hapag-Lloyd Waybill is Enforceable

As an initial matter, ELCO attacks the Waybill as void or otherwise unenforceable. In doing so, it largely relies on cases interpreting the Carmack Amendment, a statute that regulates domestic rail shipments. *See* Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. ("Resp.") at 6, ECF No. 34 (citing *Mexican Light & Power Co. v. Texas Mexican R. Co.*, 331 U.S. 731, 734 (1947)); *see* 49 U.S.C. § 11706. That Amendment, however, does not extend to the "inland segment of an overseas import shipment," and therefore does not govern this case. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 95 (2010); *see LIG Ins. Co. v. ZP Transp. Inc.*, No. 14-cv-4007, 2015 WL 4725004, at *4 (N.D. Ill July 31, 2015).

Apart from citing the Carmack Amendment, ELCO also contends that the Hapag-Lloyd Waybill is void by its own terms. In particular, ELCO spotlights one of

the Waybill's "General Conditions," which provides that "[t]his Sea Waybill is issued for a contract of Carriage which is not covered by a Bill of Lading or similar document or title." Hapag-Lloyd Waybill at 4 § 2(1). Given that "the transportation of the Pulmotil was already covered by another bill of lading," ELCO insists that "[t]he only reasonable reading of that precondition is that the Hapag-Lloyd Waybill never issued."[5] Resp. at 5.

But the Waybill "must be construed like any other contract[]: by [its] terms and consistent with the intent of the parties." *Kirby*, 543 U.S. at 31. And, to that point, the cited provision says nothing about invalidating the agreement. *See* Hapag-Lloyd Waybill at 4 § 2(1). Nor do the other "General Conditions" support ELCO's reading. *See id.* at 4 § 2. Those clauses simply elaborate instructions to the parties and select governing law; none purports to void the Waybill. *See, e.g., id.* at 4 § 2(4).

Indeed, the term ELCO invokes is best read as a choice-of-law clause. As relevant here, the Carriage of Goods by Sea Act ("COGSA") extends "to contracts of carriage covered by a bill of lading or any similar document of title." 46 U.S.C. § 30701 (Note § 1(b)). In an obvious attempt to avoid COGSA, the cited provision almost perfectly mirrors that language. *See* Hapag-Lloyd Waybill at 4 § 2(1) ("[This] contract of Carriage . . . is not covered by a Bill of Lading or similar document or

---

[5] The Court has some doubt as to whether ELCO's premise is accurate. The Danmar Waybill is not a bill of lading, as ELCO assumes, but a sea waybill. *See* Danmar Waybill at 2. The difference is that "bills of lading are negotiable, while waybills are not." *Royal & Sun All. Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 141 (2d Cir. 2010). That means that there is a serious question as to whether the Danmar Waybill qualifies as a "Bill of Lading or similar document or title." Hapag-Lloyd Waybill at 4 § 2(1). The parties neglected to brief that question, however, so the Court will not address it.

6

title."). So understood, the failure of the condition may establish that COGSA applies, but not that the Waybill is void.[6]

## B. The Hapag-Lloyd Waybill Binds ELCO

Whether the Waybill limits ELCO's recovery hinges on the rule announced in *Kirby*. *See* 543 U.S. at 33. There, a shipper engaged an intermediary to convey machinery from Australia to Alabama. *Id.* at 19. At the time, the intermediary produced a bill of lading that included a damages cap. *Id.* 19–20. It then recruited a carrier, Hamburg-Sud, to move the machinery. *Id.* at 21. Shortly thereafter, Hamburg-Sud generated a second bill of lading that adopted a lower cap on damages. *Id.* Although Hamburg-Sud managed much of the transportation itself, it hired a subcontractor to accomplish a particular leg of the journey. *Id.* at 21–22. That subcontractor damaged the machinery, the shipper sued, and the subcontractor sought refuge in the low damages cap in Hamburg-Sud's bill of lading, or, failing that, in the relatively high damages cap in the intermediary's bill of lading. *Id.*

Under those circumstances, the Court held that the subcontractor "is entitled to the protection of the liability limitations in [both] bills of lading." *Id.* at 36. In reaching that result, the Court relied on the common-law principle that "an intermediary can negotiate reliable and enforceable agreements with the carriers it engages," even if the "traditional indicia of agency" are absent. *Id.* at 33–34. "When an intermediary contracts with a carrier to transport goods," the Court elaborated,

---

[6] As an aside, the Court notes that COGSA features a one-year limitations provision that would bar ELCO's claim for the same reasons as the Hapag-Lloyd Waybill's time-for-suit clause. *See* 46 U.S.C. § 30701 (Note § 3(6)).

7

"the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and the carrier agreed." *Id*.

Applied here, that principle confirms that Spirit may use the Hapag-Lloyd Waybill as a shield against ELCO's suit. Like the shipper in *Kirby*, Eli Lilly contracted with an intermediary (here, DHL), which generated a waybill. *Id*. at 19. And, again as in *Kirby*, that intermediary engaged a carrier (here, Hapag-Lloyd) that produced a waybill of its own. *Id*. at 21–22. That puts Spirit in the same position as the *Kirby* subcontractor, meaning that it can invoke the liability limitations outlined in the Hapag-Lloyd Waybill, to which it and DHL agreed.

Neither of ELCO's efforts to evade *Kirby* is persuasive. Its primary argument hinges on Eli Lilly's expectations. "[B]ecause [an] intermediary does not have its own equipment to effectuate the carriage," ELCO posits, "the shipper knows th[at an] intermediary must contract with a carrier." Resp. at 7. Because the Danmar Waybill designated Danmar Lines as a "carrier," however, ELCO submits that Eli Lilly had no reason to anticipate that Danmar would subcontract with any other entities. *See* Danmar Waybill at 2. Therefore, ELCO concludes, it should not be bound by the Hapag-Lloyd Waybill.

That argument is difficult to square with *Kirby*. Indeed, given that "goods often change hands many times in the course of intermodal transportation," the Court recognized there that requiring subcontractors to gather information about shippers' expectations would be "very costly or even impossible." 543 U.S. at 34–35. By

8

empowering subcontractors to depend on intermediaries' promises under a "limited agency rule," the Court aimed to obviate those costs. *See id*.

ELCO's approach would frustrate that purpose. If ELCO's proposal prevailed, subcontractors like Spirit would be forced "to seek out more information before contracting, so as to assure themselves that their contractual liability limitations provide true protection." *See id*. at 35. Here, for example, Spirit could not have relied on the Hapag-Lloyd Waybill without first identifying Eli Lilly as the shipper and investigating whether it expected DHL to engage other carriers. Any carrier seeking to rely on agreements with an intermediary would need to perform similar investigations. That would impose substantial "information [costs]" and imperil "the reliability of downstream contracts." *Id*. Tellingly, ELCO fails to highlight any authority that would justify such a dramatic departure from *Kirby*'s principles.

Rejecting ELCO's approach does not mean leaving shippers helpless against intermediaries who hire subcontractors on unfavorable terms. As *Kirby* pointed out, "it seems logical that . . . [the] party that definitely knew about and was party to both of the bills of lading" must "bear responsibility for any gap between the liability limitations in the bills." *Id*. So, given that DHL was a party to both the Danmar and Hapag-Lloyd Waybills, ELCO may "retain[] the option to sue" DHL. *See id*.

In the alternative, ELCO construes *Kirby* as creating a narrow rule that only covers "liability limitations for *negligence* resulting in damage." *See* 543 U.S. at 33 (emphasis added). Because time-for-suit provisions excuse *reckless* conduct, the argument goes, *Kirby* does not apply. But courts have extended *Kirby* to one-year

9

limitations provisions generally. *See, e.g.*, *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1193–94 (9th Cir. 2013) (applying *Kirby* to a contract that "created an express [one-year] limitations period"); *Sompo Japan Ins. Co. of Am. V. Norfolk S. Ry. Co.*, 762 F.3d 165, 185 (2d Cir. 2014) (rejecting the argument "that *Kirby* is limited to provisions that limit a carrier's liability to a specified dollar amount, and does not apply to provisions that exonerate a remote carrier from liability"). And, although Spirit highlighted *Clevo* in its motion for summary judgment, *see* Def.'s Mot. Summ. J. at 8, ECF No. 32, ELCO neglected to acknowledge that case, distinguish it, or cite any contrary authority.

In short, *Kirby* dictates that ELCO must honor the liability limitations outlined in the Hapag-Lloyd Waybill in a suit against Spirit.

**C.     Spirit's Conduct Falls Within the Hapag-Lloyd Waybill's Scope**

ELCO next argues that the Waybill's limitations provisions do not cover Spirit's storage of the Pulmotil. In articulating this theory, ELCO draws on the common-law doctrine of unreasonable deviations. Under that doctrine, "a geographic deviation from a scheduled route of voyage strip[s] a carrier of its defense to liability based on exculpatory provisions of a bill of lading." *Mbacke v. Transcon Cargo, Inc.*, No. CIV. S06-1356, 2008 WL 220369, at *5 (E.D. Cal. Jan. 25, 2008). Some courts have expanded the doctrine to a limited set of "other contexts," such as "stowage of cargo on deck." *Id.* at *5; *see Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165, 1170 (9th Cir. 1998).

10

But courts have refused to extend the doctrine of unreasonable deviations to time-for-suit provisions. In applying that doctrine to COGSA, for example, the Fifth and Eleventh Circuits have held that "[a]n unreasonable deviation does not prevent a carrier from invoking the one-year limitations period under [that Act]." *Bunge Edible Oil Corp v. M/Vs' Torm Rask & Fort Steele*, 949 F.2d 786, 788 (5th Cir. 1992); *accord Mesocap Ind. Ltd. v. Torm Lines*, 194 F.3d 1342, 1344 (11th Cir. 1999). As the Eleventh Circuit explained, "an unreasonable deviation logically disturbs only the parties' expectations concerning the risk of loss, but not their expectations about when they can sue." *Mesocap*, 194 F.3d at 1344–45; *see Switz. Gen. Ins. Co. of Zurich v. Navigazione Libera Triestina, S.A.*, 91 F.2d 960, 963 (2d Cir. 1937). The Court sees no reason to chart a different course here, and ELCO offers none.

In any event, even if the doctrine of unreasonable deviations were to apply, it would not salvage ELCO's claim. What counts as a deviation depends on "the scope of the carriage contract." *Taisho Marine & Fire Ins. Co. v. Maersk Line, Inc.*, 796 F. Supp. 336, 340 (N.D. Ill. 1992). And crucially, the time-for-suit provision dictates that "the Carrier shall be discharged from all liability . . . *connected or related* to the Carriage." Hapag-Lloyd Waybill § 6 (emphasis added). Indeed, the Waybill expressly authorizes carriers to use "any means of Carriage or storage whatsoever," to "proceed at any speed," to "store the Goods temporarily at any place," and to perform "repairs." *Id*. § 17(1). Given that broad language, no reasonable factfinder could classify the storage of the Pulmotil and removal of the placard from its container as unconnected to the carriage. Accordingly, Spirit did not unreasonably deviate from the Waybill.

**D.     The Time-for-Suit Provision Covers Reckless Conduct**

Finally, ELCO contends that the Hapag-Lloyd Waybill's time-for-suit provision by its terms exonerates only negligent acts, not reckless or intentional ones. In support, ELCO stresses that a different provision, *see* Hapag-Lloyd Waybill § 5(2)(h)–(i), imposes a damages cap unless "the damage resulted from an act or omission . . . done with intent to cause damage, or recklessly," *id*. § 5(2)(j). But the cited provision only cabins the application of the damages cap; it has nothing to do with the one-year limitations period. The result is that the time-for-suit clause bars ELCO's claim regardless of whether Spirit acted recklessly.

## Conclusion

For the reasons given above, Spirit's motion for summary judgment is granted. Judgment is awarded in favor of Defendant and against Plaintiff. This case is terminated.


IT IS SO ORDERED.                               ENTERED:  10/29/20

                                                                                  _____
                                                                                  **JOHN Z. LEE**
                                                                                  **United States District Judge**